# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MABLE S. JONES, MD, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | NO.    12-5349 |
| TEMPLE UNIVERSITY, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM

BUCKWALTER, S.J.                                                    July 10, 2014

Currently pending before the Court is Defendant Temple University ("Defendant")'s

Motion for Summary Judgment as to all claims asserted by Plaintiff Mable S. Jones, MD

("Plaintiff").  For the following reasons, Defendant's Motion for Summary Judgment is granted.

## I.  FACTUAL HISTORY[1]

_____

[1] The statement of facts is compiled from a review of the parties' briefs and the evidence submitted in conjunction with those briefs. To the extent the parties allege a fact that is unsupported by evidence, the Court does not include it in the recitation of facts.  In her Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, Plaintiff "incorporates herein by reference the Declaration of Mable S. Jones, M.D. and Plaintiff's Appendix in Opposition to Defendant's Motion for Summary Judgment."  (Pl.'s Mem. Opp. Summ. J. 1.)  The Appendix contains fifty-six exhibits, only several of which are specifically referenced in the Memorandum of Law.  Accordingly the Court has reviewed and considered those cited exhibits to which Plaintiff has directed the Court's attention.  See Doeblers' Pennsylvania Hybrids, Inc. v. Doebler, 442 F.3d 812, 820 (3d Cir. 2006) ("As noted by the Seventh Circuit, "'Judges are not like pigs, hunting for truffles buried in' the record.") (quoting Albrechtsen v. Bd. of Regents of Univ. of Wis. Sys., 309 F.3d 433, 436 (7th Cir. 2002) (internal quotation omitted)); see also Perkins v. City of Elizabeth, 412 F. App'x 554, 555 (3d Cir. 2011) (noting that "a court is not obliged to scour the record to find evidence that will support a party's claims.") (citing Doeblers' Pennsylvania Hybrids, Inc. v. Doebler, 442 F.3d 812, 820 n.8 (3d Cir. 2006)).

Plaintiff is an African American female formerly employed by Defendant Temple University Hospital, which is located in Philadelphia, Pennsylvania and which is part of Temple University of the Commonwealth of Pennsylvania System of Higher Education.  (Compl. ¶¶ 1– 2.)  Plaintiff is a graduate of the Louisiana State University School of Medicine, is Board Certified by the American Board of Radiology, and holds a Certification of Added Qualification in Neuroradiology.  (Id. ¶ 13.)  Prior to working for Defendant, Plaintiff worked for the University of Pennsylvania, where twenty percent of her time was spent on mammography work, twenty percent on body imaging, and sixty percent on neuroradiology work.  (Pl.'s Mem. Opp. Summ. J. 2.)

Defendant hired Plaintiff on or about November 26, 2007, as a part-time physician on-call radiologist at an hourly rate of $166.06.[2]  (Id. ¶ 11.)  Defendant employed Plaintiff as a radiologist for nearly three years.  (Id. ¶ 12.)  Plaintiff was hired to work four days per week, but maintains that she "routinely worked five (5) days per week at the request of Dr. Charles Jungreis."  (Pl.'s Mem. Opp. Summ. J. 2; Pl.'s Mem. Opp. Summ. J., Appendix Ex. 2, Deposition of Dr. Mable S. Jones ("Jones Dep."), Vol. I, 44:19–25; 51:12–23, Aug. 7, 2013.) Plaintiff claims that she "worked as a full time employee during much of her tenure at Temple." (Compl. ¶ 11.)  Unlike her colleagues, Plaintiff was not hired as a faculty member.  (Pl.'s Mem. Opp. Summ. J. 2.)  According to Dr. Jungreis, there were no faculty positions available at the time that Plaintiff was hired as a part-time radiologist.  (Id. at 2 n.5.)  Plaintiff asserts that she had prior teaching experience and that she made numerous requests to Dr. Beverly Hershey that she be placed on the resident teaching schedule or allowed to teach at resident conferences, but

---

[2] At the time Defendant hired Plaintiff, and at all times thereafter, Defendant had greater than fifteen employees.  (Compl. ¶ 5.)

that Dr. Hershey did not place her on the schedule or invite her to teach at conferences.[3]  (Id. at

2.)  Plaintiff testified at her deposition that the last time she presented at a resident conference

was prior to 2002.  (Jones Dep. Vol. II, 45:18–24, Sept. 9, 2013.)

During Plaintiff's employment with Defendant she was the only African American

physician in the radiology department, and she was the first African American physician on the

Radiology Department staff in over twenty-five years.  (Compl. ¶ 14.)  In 2009, subsequent to

hiring Plaintiff, Defendant hired six male radiologists, one of Indian descent and five of

Caucasian descent, and two female radiologists, both of Caucasian descent.  (Id. ¶ 22A.)[4]

Plaintiff claims that "[s]imilarly situated, non[-]African American radiologists were not similarly

treated, disciplined, transferred or terminated" as Plaintiff was.  (Id. ¶ 21B.)

Plaintiff was hired as a non-faculty, part-time hourly physician in Temple's

neuroradiology department at Temple's main campus ("Temple Main").  (Def.'s Mem. Supp.

Mot. Summ. J. 4; Def.'s Mem. Supp. Mot. Summ. J., Ex. L; Jones Dep. Vol. I, 45:1–17.)

Plaintiff indicated on her employment application that she was seeking a part-time position.

---

[3] Plaintiff claims that "Dr. Hershey's refusal to grant Dr. Jones' requests likely was due to the animosity that Dr. Hershey exhibited toward Dr. Jones, including comments that Dr. Jones believed were discriminatory."  (Pl.'s Mem. Opp. Summ. J. 2.)  As evidence of this assertion, Plaintiff relies on her deposition testimony regarding "general rudeness towards [her]," as well as an instance Plaintiff recalled when Dr. Hershey walked up behind her at a computer workstation and said she had been working on that computer "in a manner that was not professional," according to Plaintiff.  (Jones Dep. Vol. I, 82:17–21.)  Plaintiff also testified at her deposition that she believed it was "clearly clear racial exclusion" when another doctor had a baby and photos of the baby were sent to other staff members and residents but not to Plaintiff.  (Id. at 82:22–7)  Plaintiff also testified regarding occasions when Dr. Hershey or Dr. O'Connor, both women, corrected her or disagreed with her in front of other colleagues regarding radiology films, which Plaintiff asserts is evidence of racial discrimination.  (Id. at 83:23–87:25.)  Neither Dr. Hershey nor Dr. O'Connor were Plaintiff's supervisors.  (Id. at 80:21–24; 83:12–16.)

[4] Plaintiff's Complaint is erroneously numbered with paragraphs 21 and 22 following paragraphs 21 and 22.  In order to distinguish those numbered paragraphs, the Court refers to the first paragraph 21 as 21A and the second paragraph 21 as 21B, and the first paragraph 22 as 22A and the second paragraph 22 as 22B.

(Def.'s Mem. Supp. Mot. Summ. J., Ex. N, Jones Employment Application.)  Initially, Plaintiff

did not receive benefits because Temple employees scheduled for less than thirty-five hours per

week are not eligible for benefits.  (Def.'s Mem. Supp. Mot. Summ. J., Ex. O, Deposition of

Gregory Zimmaro ("Zimmaro Dep."), 14:24–15:8; 41:15–44:17, Oct. 10, 2013.)  Plaintiff's

supervisors were Dr. Charles Jungreis, Chair of Radiology, and Dr. Jeffrey Kochan,

Neuroradiology Section Chief, both of whom are Caucasian males.  (Id. ¶¶ 15–16.)  Six

physicians reported to Dr. Kochan, and Plaintiff was the only African American female.  (Id. ¶

17.)  Plaintiff claims that she was the only physician reporting to Dr. Kochan who was hired

without benefits, did not receive an academic appointment, did not have an office or secretarial

support, and was not invited to give resident conferences.  (Id.)

       Soon after Plaintiff began her employment at Temple Main, she advised Dr. Jungreis that

she did not have office space or secretarial support, and was told that she should share office

space with her colleagues.[5]  (Jones Dep. Vol. I, 45:24–47:12.)  Plaintiff testified that she used an

office space at Temple Main for her belongings, but did not conduct business activities in that

space.  (Id.)  Plaintiff did not explain why she did not conduct business in the shared office

space.  (Def.'s Mem. Supp. Mot. Summ. J. 5 n.3.)

       Prior to Plaintiff's employment with Defendant, physician duty at Roxborough

Hospital—a Temple facility—was rotated among neuroradiologists.  After Defendant hired

Plaintiff, however, she was assigned sole responsibility of Roxborough Hospital.  (Compl. ¶

---

[5] Dr. Pallav Shah, Assistant Clinical Professor of Radiology, who was one of Plaintiff's
colleagues in the neuroradiology department when she worked at Temple Main, also shared
office space and a secretary with other faculty members.  (Def.'s Mem. Supp. Mot. Summ. J. 6;
Def.'s Mem. Supp. Mot. Summ. J., Ex. P, Deposition of Dr. Shah ("Shah Dep."), 24:2–6; 29:16–
21, Oct. 11, 2013.)  Dr. Shah held a full-time, faculty position with teaching and resident
responsibilities, as full-time faculty members are placed on a department-wide schedule to
provide lectures to residents.  (Def.'s Mem. Supp. Mot. Summ. J. 5–6; Shah Dep., 17:3–24;
18:1–7; 27: 18–19; 28:1–10.)

19(A).)  At some point while at Temple, Plaintiff was removed from Magnetic Resonance

Imaging ("MRI") duty and placed entirely on Computerized Axial Tomography ("CAT") scan

duty.  (Compl. ¶ 19(B).)  Plaintiff claims that she was moved from MRI duty to CAT scan duty

"to give the more desired rotation to other non[-]African American neuroradiologists."  (Id.)

       According to Plaintiff, in or about February 2009, Defendant moved Plaintiff from the

Neuroradiology Section at Temple to the Outreach Section at Jeanes Hospital.[6]  (Compl. ¶ 18.)

Plaintiff was not offered the Outreach Director position, although Plaintiff believes she had

adequate prior years of experience providing radiology services to clinicians at Jeanes Hospital

to have held such a position.  (Id. ¶ 19(C).)  Plaintiff asserts that Defendant placed a non-African

American male in the position of Outreach Director.  (Id.)  At her deposition, Plaintiff testified

that "being a black female contributed to [her] exclusion from consideration," but when asked

whether she had evidence of that Plaintiff answered "[o]nly the past practices in the radiology

department at Temple."  (Jones Dep. Vol. I, 110:24–25.)  According to Defendant, in 2009,

Plaintiff was offered, and accepted, a salaried position as a neuroradiologist at Jeanes Hospital

("Jeanes"), a hospital with which Defendant had just signed a contract to provide radiology

services.  (Def.'s Mem. Supp. Mot. Summ. J. 6; Def.'s Mem. Supp. Mot. Summ. J., Ex. F,

Deposition of Charles Jungreis ("Jungreis Dep."), 66:15–22; 68:10–13, Sept. 13, 2013.)  At that

time Plaintiff indicated it was her strong preference to work part-time.  (Jungreis Dep., at 43:5–

21; 44:23–24.)  Pursuant to Plaintiff's request to work part-time, her position was characterized

as an "8/10ths" position, which allowed her to receive benefits even though she was not working

full-time.  (Zimmaro Dep., 42:17–24; 43:1–6.)  According to Plaintiff, she continued to work

five days per week "on occasion whenever asked by Dr. Jungreis."  (Pl.'s Mem. Opp. Summ. J.

_____

[6] As Plaintiff testified in her deposition, four other Temple physicians moved to Jeanes Hospital
at the same time Plaintiff did.  (Jones Dep. Vol. I, 58:24–59:9.)

2.)  Once at Jeanes, Plaintiff spent about ten percent of her time doing body imaging work.  (Id.)

Because there are no residents at Jeanes, there are no faculty positions available for radiologists

stationed there and accordingly Plaintiff's position at Jeanes was non-faculty.  (Jungreis Dep.,

63:9–14.)  Because Plaintiff was not a faculty member while at Jeanes, her employment contract

only required ninety days' notice prior to elimination of her position, whereas faculty members'

contracts required one year's notice.  (Def.'s Mem. Supp. Mot. Summ. J., Ex. A; Def.'s Mem.

Supp. Mot. Summ. J., Ex. E, Deposition of Ronald Zink ("Zink Dep."), 61:12–19, Sept. 19,

2013.)

       Around the same time Temple obtained the Jeanes contract, Dr. Jungreis met with Dr.

Larry Caputo about the possibility of joining Temple as Chairman of the Radiology Department

at Jeanes.  (Def.'s Mem. Supp. Mot. Summ. J., Ex. R, Deposition of Larry Caputo ("Caputo

Dep."), 10:1–9; 11:5–10, Aug. 12, 2013.)  At that time, Dr. Caputo was the Chairman of the

Radiology Department at an affiliate of Methodist Hospital, a position he had held for twenty

years, and was a radiologist with twenty-nine years' experience.  (Id. at 9:7–15.)  The Jeanes

chairperson position was not posted or publicly advertised, and Dr. Jungreis did not interview

any other individuals for the position.  (Jungreis Dep., 53:2–21.)  According to Defendant, Dr.

Caputo was selected for the chairman position because of his experience and because several

Temple faculty members who had previously worked with him strongly recommended him.

(Jungreis Dep., 53:17–21.)  Dr. Caputo accepted the full-time position at Jeanes.  (Def.'s Mem.

Supp. Mot. Summ. J., Ex. S; Caputo Dep., 7:19–21; 12:14–16.)

       According to Plaintiff, when she was told she would be moving to Jeanes, she asked Dr.

Jungreis if she would be working in an administrative capacity and was advised that Dr. Caputo

had already been selected as chairperson.  (Jones Dep. Vol. I, 102:15–22.)  Plaintiff told Dr.

Jungreis that she would have been interested in the chairperson position. (Jungreis Dep., 54:3–55:16.) Plaintiff was not made aware of the position prior to Dr. Caputo's selection, and the position was not posted even though Dr. Jungreis knew that Defendant's policy at the time was that all vacant and new job positions be posted. (Id. at 49:11–51:22; 60:8–61:5.)

Plaintiff alleges that while at Temple she worked in a "racially hostile environment where staff made racially disparaging comments and jokes." (Compl. ¶ 20.) Plaintiff alleges the following comments were made in her presence:

> (1) When braided hair was visible outside the skull of female African American patients on CAT Scans, the joke was, "she's [referring to Dr. Jones] got THE hair;"
> (2) Black and Hispanic trauma victims were ridiculed as being members of the knife and gun club;
> (3) AIDS was discussed in racially biased terms;
> (4) The reference to "in our population" was used to denigrate Black and Hispanic patients.

(Id. ¶ 20.) Plaintiff also claims that non-African American colleagues tried to discredit her with residents. (Id.) Plaintiff testified at her deposition that in 2008, residents made demeaning, racially charged comments in her presence, and that some staff neuroradiologists participated in one racially insensitive joke. (Jones Dep. Vol. I, 81:14–91:2.) Plaintiff also testified that she did not complain about those incidents to anyone in Temple's human resources department, Dr. Jungreis, or anyone in a supervisory role at Temple University Physicians ("TUP"). (Id. at 91:3–92:5; 95:9–15; 107:6–22.) Plaintiff testified that after she advised the residents who made the comments that she considered them to be inappropriate, the comments ceased. (Id. at 91:12–15.) Plaintiff did not make any complaints of discrimination, formal or informal, during her approximately three years of employment with Defendant. (Id. at 78:18–79:17.)

In 2009, Defendant predicted a revenue budget deficit for TUP for fiscal year 2010, and a decision was reached that TUP must reduce the number of staff and give terminal letters to

multiple faculty and physicians as a result.  (Def.'s Mem. Supp. Mot. Summ. J. 2; Def.'s Mem. Supp. Mot. Summ. J., Ex. B, Affidavit of John Daly ("Daly Aff."), ¶¶ 7–14, Sept. 7, 2011.) Defendant eliminated positions in multiple departments within TUP.  (Def.'s Mem. Supp. Mot. Summ. J. 2–3; Def.'s Mem. Supp. Mot. Summ. J., Ex. C; Def.'s Mem. Supp. Mot. Summ. J., Ex. D, Deposition of John Daly ("Daly Dep."), 40:1–24, Sept. 17, 2013.)  In late 2009, Dr. Daly, Dr. Jungreis, Ronald Zink, and Thomas Kupp discussed TUP's budgetary constraints and advised Dr. Jungreis that the radiology department needed to eliminate at least one position.  (Def.'s Mem. Supp. Mot. Summ. J. 3; Zink Dep., 21:7–17; 52:4–19; Daly Aff. ¶ 11.)  A decision was reached that one physician in the neuroradiology department, a sub-department of the radiology department, would be eliminated, because that department had an insufficient volume of work to support the number of neuroradiologists on staff in comparison with the volume in other departments, based on TUP's evaluation methods.  (Def.'s Mem. Supp. Mot. Summ. J. 3; Jungreis Dep., 76:14–17; 81:19–24; 82:1–2; Def.'s Mem. Supp. Mot. Summ. J., Ex. G.)  At that time, Temple had eight neuroradiologists in the Radiology Department (Def.'s Mem. Supp. Mot. Summ. J. 3; Jungreis Dep., 76:18–20.)  Plaintiff was the only part-time neuroradiologist. (Jungreis Dep., 77:17.)  Defendant maintains that Plaintiff's position was selected for elimination because (1) she was the only non-full-time neuroradiologist and her work could be more easily absorbed by the remaining neuroradiologists in that department; (2) Temple was in the process of instituting a picture archival system ("PACS") voice recognition software, which would allow neuroradiology films to be read remotely and which lessened the need for a neuroradiologist to be stationed at Jeanes Hospital; and (3) Plaintiff's contract required ninety days' notice prior to elimination of her position, whereas the other neuroradiologists in the department had contracts that required one year's notice.  (Def.'s Mem. Supp. Mot. Summ. J. 3–4; Zink Dep., 61:12–19;

Jungreis Dep., 77:14–23; 85:5–8; Def.'s Mem. Supp. Mot. Summ. J., Ex. I, Deposition of Charles Harris ("Harris Dep."), 7:10–13, Sept. 5, 2013.)

On or about January 8, 2010, Plaintiff was advised that her position would be eliminated effective April 9, 2010, because "the neuroradiographic work had not met Temple's anticipated departmental volume." (Def.'s Mem. Supp. Mot. Summ. J. 4; Def.'s Mem. Supp. Mot. Summ. J., Ex. G.) In March 2010 Plaintiff was advised that her employment would be extended through June 30, 2010, and in June 2010, Plaintiff's employment was extended again through October 31, 2010 because the PACS software required additional implementation time. (Def.'s Mem. Supp. Mot. Summ. J. 4; Def.'s Mem. Supp. Mot. Summ. J., Exs. J, K; Jungreis Dep., 85:2–8; 94:16–24; 95:1–8.) Defendant terminated Plaintiff's employment on October 31, 2010. (Compl. ¶ 21A.)

Dr. Jungreis testified at his deposition that he did not receive training on Defendant's nondiscrimination policy, but that one of his responsibilities was to ensure a diverse radiology staff. (Pl.'s Mem. Opp. Summ. J. 6; Jungreis Dep., 23:18–25:5.) He also testified that he did not consider whether firing Plaintiff had any equal employment opportunity or affirmative action impact and that the issue did not occur to him and was not a factor in the decision to terminate Plaintiff's employment.[7] (Pl.'s Mem. Opp. Summ. J. 6; Jungreis Dep., 28:20–29:2.) Gregory Zimmaro, Assistant Dean of Human Resources and Administration for Temple Medical School, testified that he was responsible for reviewing separations to ensure nondiscrimination, and while he reviewed the decision to terminate Plaintiff, he did not have a role in the decision.

---

[7] Dr. Jungreis also testified that he was not required to obtain Human Resources input in connection with employment separations, and did not know whether a particular person or office monitored employment separations to ensure Defendant's nondiscrimination policy was not violated in connection with the separation. (Pl.'s Mem. Opp. Summ. J. 6; Jungreis Dep., 27:2–6.)

(Pl.'s Mem. Opp. Summ. J. 6; Zimmaro Dep., 15:22–17:23.)  Plaintiff's "separate

neuroradiologist" position at Jeanes Hospital continues to remain eliminated.[8]  (Jungreis Dep.,

131:19–132:1.)  Plaintiff alleges there was no legitimate, non-discriminatory basis for her

termination.  (Compl. ¶ 22B.)

Plaintiff asserts that she applied for more than fifty positions after learning Defendant

would terminate her, but has not obtained employment.[9]  (Id. ¶ 23.)  According to Plaintiff, she

began applying for positions outside of Temple in January 2010, around the time Defendant

advised her that her position was being eliminated.  (Def.'s Mem. Supp. Mot. Summ. J., Ex. U,

Def.'s First Set of Interrogatories and Pl.'s responses thereto.)  Plaintiff claims she has not

previously had any difficulty in obtaining employment and therefore believes she has been

subject to retaliation by Defendant, resulting in her inability to obtain work.  (Compl. ¶ 23.)  Dr.

Kochan testified that two of Plaintiff's prospective employers contacted him following her

departure from Defendant, and that he provided a positive reference for Plaintiff on both

occasions.  (Kochan Dep., 83:21–64:19.)

---

[8] Plaintiff notes that after she was given notice that her employment with Defendant would end,
Defendant hired Anne Moch Steinberg, "a White female radiologist," to do mammography and
neuroradiology readings.  (Pl.'s Mem. Opp. Summ. J. 5.)  At some point following her separation
from the University of Pennsylvania, Plaintiff's certification in mammography lapsed.  (See
Jones Dep. Vol. I, 14:25–15:3 ("Q. Are you currently certified to review mammography slides?
A. No.").)  According to Dr. Jungreis, Defendant hired Dr. Anne Moch because she had
"mammography and body imaging skills," skills which Dr. Jungreis believed Plaintiff did not
have.  (Jungreis Dep., 135:22–136:1; 143:11–15.)  After Dr. Moch left Temple, Dr. Devenney-
Cakir was hired and later resigned in order to take a job with a competitor where she could do
more neuroradiology work.  (Jungreis Dep., 143:18–144:17.)

[9] In 2011, Plaintiff was offered one part-time position, which she turned down because the
position would have required Plaintiff to travel to California at her own expense for two eight-
hour shifts every other month.  (Jones Dep. Vol. II, 26:7–27:8.)  Plaintiff had listed Temple as a
previous employer on her application for the position that she was offered.  (Id. at 27:22–28:2.)

### H. **Procedural History**

On or about May 25, 2011, Plaintiff filed charges of discrimination with the Pennsylvania Human Relations Commission ("PHRC"), and alleged that she was the target of discriminatory treatment because of her race and sex. (Compl. ¶ 7(A).) Plaintiff believes that treatment was intentionally imposed on her in a discriminatory manner which caused the loss of her employment as well as emotional distress. (Id.) Plaintiff's charges of discrimination were cross-filed with the United States Equal Employment Opportunity Commission ("EEOC"). (Id. ¶ 8.) PHRC administratively processed Plaintiff's discrimination charges, but ultimately did not find cause for discrimination and dismissed Plaintiff's charges. (Id. ¶ 9.) Plaintiff sought a Notice of Right to Sue letter, which she received on August 9, 2012. (Id. ¶ 10.) Plaintiff filed the Complaint in this case on September 19, 2012, less than ninety days after receipt of the Notice of Right to Sue letter, and accordingly the Complaint was timely filed. (Id. ¶ 10.) The Complaint alleges that Defendant discriminated against Plaintiff on the basis of race and gender in violation of federal and state law and retaliated against her in violation of federal and state law, specifically 42 U.S.C. § 2000e et seq., 42 U.S.C. § 1981, The Pennsylvania Human Relations Act, 43 Pa. C.S. §§ 951–963, and 42 U.S.C. § 1983. Defendant filed its Motion for Summary Judgment on December 30, 2013. Plaintiff filed her Answer to Defendant's Motion for Summary Judgment on February 25, 2014. As the briefing process has been exhausted, Defendant's Motion for Summary Judgment is now ripe for judicial consideration.

## II. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A factual dispute is

"material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims."  Id. at 325.  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate.  Celotex, 477 U.S. at 322.  Moreover, the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue.  Anderson, 477 U.S. at 249–50.

## III.    DISCUSSION

Plaintiff advances federal and state law discrimination claims.  First, Plaintiff claims that she was discriminated against on the basis of race and gender both during her employment and in connection with the termination of her employment with Defendant in violation of Title VII. Specifically, Plaintiff alleges that Defendant discriminated against her by failing to select her as Chief of Radiology at Jeanes, and by terminating her employment.  Second, Plaintiff advances a discrimination claim on the basis of race and gender under 42 U.S.C. § 1981.  Third, in addition to her federal claims, Plaintiff advances state law claims of race and gender discrimination and retaliation under the Pennsylvania Human Relations Act, 43 Pa. C.S. §§ 951–963, on the same grounds as her Title VII claims.  Finally, Plaintiff claims that Defendant, a state entity which acts under color of state law, violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by discriminating against her on the basis of race and sex in violation of 42 U.S.C. § 1983.  The Court addresses each of these claims in turn, and after careful consideration, finds that summary judgment for Defendant is appropriate with respect to the entirety of Plaintiff's Complaint.

### A.    Title VII Claims[10]

In a case of employment discrimination such as the present matter, the claim is governed by the three step burden-shifting framework developed in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under the McDonnell Douglas model, the plaintiff is first required to set forth sufficient evidence to establish a *prima facie* case.  "Under that familiar test, the plaintiff must first establish a *prima facie* case of discrimination by showing that: (1) s/he is a member of

---

[10] Plaintiff also alleges discrimination and retaliation claims under the Pennsylvania Human Relations Act.  The Court addresses these claims in conjunction with the Title VII claims because "[t]he proper analysis under Title VII and the Pennsylvania Human Relations Act is identical, as Pennsylvania courts have construed the protections of the two acts interchangeably." Weston v. Pa., 251 F.3d 420, 425 n.3 (3d Cir. 2001).

a protected class; (2) s/he was qualified for the position s/he sought to attain or retain; (3) s/he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination.  Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008) (citing McDonnell Douglas, 411 U.S. at 802; Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1066 n.5 (3d Cir. 1996) (en banc)).

Once a *prima facie* case is established, the second stage shifts the burden of production to the defendant, where the defendant must produce evidence sufficient to support a finding that there was a legitimate, nondiscriminatory reason for the employment action.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506–07 (1993).  The burden on the defendant at this juncture is "relatively light," and the defendant can satisfy it "by introducing evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision."  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).  "The employer need not prove that the tendered reason actually motivated its behavior, as through this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff."  Id.  Summary judgment should be granted for the plaintiff if the defendant is unable to satisfy this burden.  Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997).

Once the defendant articulates such reasons, the burden reverts back to the plaintiff, who must show by a preponderance of the evidence that those legitimate reasons were a pretext for discrimination.  Fuentes, 32 F.3d at 763.  In order to defeat a summary judgment motion, the plaintiff must produce evidence which would allow a factfinder "reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)."  Id. (internal citations omitted); see also Robinson v. Matthews Int'l Corp., No.

14

Civ.A.09–1965, 2010 WL 763869, at *3 (3d Cir. Mar. 8, 2010).  To discredit the employer's proffered reason . . . the plaintiff cannot simply show that

> the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent.  Rather, the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence.

Fuentes, 32 F.3d at 765.  In other words, "the question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is discrimination."  Keller, 130 F.3d at 1109 (quoting Carson v. Bethlehem Steel Corp., 83 F.3d 157, 159 (7th Cir. 1996)).

In an effort to further define the boundaries of the pretext inquiry at the summary judgment stage, the United States Court of Appeals for the Third Circuit has emphasized that the plaintiff must "point to some evidence, direct or circumstantial, from which a fact-finder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Fuentes, 32 F.3d at 764.  Under the first method, the plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact-finder could rationally find them 'unworthy of credence' and hence infer that 'the employer did not act for [the asserted] non-discriminatory reasons.'"  Id. (internal citations omitted); see also Gilbert v. Phila. Media Holdings, 564 F. Supp. 2d 429, 434 (E.D. Pa. 2008).  Unless there is evidence of discrimination, the court is neither permitted to get involved in the subjective business decisions of the employer, nor set its own employment standards for the employer.  See Ezold v. Wolf, Block, Schorr & Solis–Cohen, 983 F.2d 509, 527 (3d Cir. 1992).

"Alternatively, through the second method outlined in <u>Fuentes</u> to prove that the defendant's proffered legitimate and non-discriminatory reason is merely pretext, a plaintiff could show that invidious discrimination was more likely than not a motivating or determinative factor in the defendant's adverse employment action." <u>Gilbert</u>, 564 F. Supp. 2d at 434 (citing <u>Fuentes</u>, 32 F.3d at 764).  In other words:

> the plaintiff must point to evidence with sufficient probative force that a factfinder could conclude by a preponderance of the evidence that [race] was a motivating or determinative factor in the employment decision.  For example, the plaintiff may show that the employer has previously discriminated against [him or her], that the employer had discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class.

<u>Simpson v. Kay Jewelers, Div. of Sterling, Inc.</u>, 142 F.3d 639, 644–45 (3d Cir. 1998) (internal citations omitted).

### 1.  Race Discrimination

Count One of Plaintiff's Complaint alleges that Plaintiff was hired under less desirable circumstances, transferred, disciplined, not promoted, and ultimately terminated because of her race, and that non-African American employees similarly situated to plaintiff were not similarly hired, transferred, disciplined, not promoted, and did not ultimately lose their employment.  Defendant argues first that Plaintiff has not established a *prima facie* case of discrimination, because she has not identified any similarly-situated individual who was retained as part of Defendant's layoffs.  Defendant further argues that even if Plaintiff established a *prima facie* case, (1) Defendant had no duty or reason to consider Plaintiff for the promotion to the chairperson position and there is no evidence to suggest that Defendant's reason for selecting Dr.

Caputo was pretextual, and (2) Defendant has demonstrated legitimate reasons for laying off Plaintiff which Plaintiff cannot show are pretextual.  Plaintiff responds that she has established a *prima facie* case and that with respect to both her non-selection claim and her termination claim she has produced sufficient evidence of pretext such that summary judgment for Defendant is inappropriate.

### a.  Plaintiff's Non-selection Claim

Plaintiff asserts that she has established a *prima facie* case of race discrimination with respect to Defendant's failure to select her as Chief of Radiology at Jeanes Hospital because she "is a Black female," "based upon her prior experience, she was qualified to serve as Chief of Radiology," and because Defendant "selected a White male for the position of Chief of Radiology."  (Pl.'s Mem. Opp. Summ. J. 11–12.)  Defendant argues that Plaintiff has not established a *prima facie* case of discrimination with respect to her non-selection claim because Plaintiff did not apply for the position of Chief of Radiology, and because Defendant had no reason or duty to consider Plaintiff for that position.  In support of its argument, Defendant relies on a Third Circuit case, Fowle v. C&C Cola, 868 F.2d 59 (3d Cir. 1989), which found that where an employer has not given formal notice of a position's availability, the employer has an obligation to consider those employees "who might reasonably be interested" in the position.  See id. at 68.  Defendant argues that because the Chief of Radiology position was a full-time, faculty position, Defendant had no reason to believe that Plaintiff would "reasonably be interested" in that position because at the time she was assigned to Jeanes Hospital, she expressed a desire to work part-time.  Therefore, according to Defendant, Plaintiff cannot establish a *prima facie* case of discrimination regarding her non-selection as Chief of Radiology.  Plaintiff does not address Defendant's argument as part of the *prima facie* case analysis, but

rather argues that Defendant's explanation is not a legitimate, non-discriminatory reason for not selecting Plaintiff as Chief.  (Pl.'s Mem. Opp. Summ. J. 12.)

Assuming *arguendo* that Defendant should reasonably have known that Plaintiff would have been interested in the Chief of Radiology position for which Dr. Caputo was selected, the Court finds that Defendant has put forth legitimate, non-discriminatory reasons for selecting Dr. Caputo over Plaintiff.  Defendant explains that Dr. Caputo had twenty-nine years of experience as a radiologist and twenty years of experience as an administrator, ten years of administrative experience more than Plaintiff; and Dr. Caputo was recommended by Temple employees who had worked with him in the past.  Plaintiff argues that those reasons are pretextual, because (1) Defendant has a "poor track record of hiring Black physicians;" (2) Dr. Jungreis failed to post the position of Chief of Radiology, "in violation of defendant's policy that required that the position be posted;" (3) Dr. Jungreis aggressively pursued Dr. Caputo to the exclusion of any other qualified candidate; and (4) Dr. Jungreis contended in his deposition that Chief of Radiology was not a separate position and therefore did not have to be posted in accordance with Temple's policies.  (Pl.'s Mem. Opp. Summ. J. 13.)  Plaintiff argues that Dr. Jungreis's "suggested justification merely underscores Dr. Jungreis' desire to select Dr. Caputo for the position, regardless of the qualifications of other potential candidates, such as [Plaintiff]."  (Id.)

Plaintiff and Defendant disagree over whether Chief of Radiology was a separate vacancy that should have been posted according to Temple rules, rather than "a leader in the group" that was "not a specific job."  (Jungreis Dep., 60:9–61:5.)  Correct or not, Dr. Jungreis's viewpoint regarding the necessity of posting the Chief of Radiology role does not show that Dr. Jungreis's decision to select Dr. Caputo was motivated by discrimination.  Plaintiff has not shown "weaknesses, implausibilities, inconsistencies, or contradictions" in Defendant's explanations for

18

its selection of Dr. Caputo as Chief of Radiology such that under the first <u>Fuentes</u> test the Court could find those reasons as "unworthy of credence" and infer that Defendant selected Dr. Caputo for any reasons other than those provided.  <u>See</u> <u>Fuentes</u>, 32 F.3d at 764.  Nor has Plaintiff shown under the second method in <u>Fuentes</u> that "invidious discrimination was more likely than not a motivating or determinative factor" in Dr. Jungreis's decision to select Dr. Caputo rather than Plaintiff as Chief of Radiology.  <u>See</u> <u>Gilbert</u>, 564 F. Supp. 2d at 434 (citing <u>Fuentes</u>, 32 F.3d at 764).

As Plaintiff has not shown that the legitimate, non-discriminatory reasons offered by Defendant for its selection of Dr. Caputo as Chief, rather than Plaintiff, were mere pretext, the Court will grant Defendant's Motion for Summary Judgment with respect to Plaintiff's Title VII non-selection claim.

### b.  Plaintiff's Termination Claim

Plaintiff asserts that she has established a *prima facie* case of discrimination with respect to her termination because she "is Black," "competently performed the duties required by her position as a neuroradiologist," "was terminated," and "similarly situated non-Black neuroradiologists were treated more favorably in that they were not fired, and [Plaintiff's] termination occurred under circumstances that give rise to an inference of discrimination."  (Pl.'s Mem Opp. Summ. J. 13–14.)  Defendant argues that Plaintiff did not establish a *prima facie* case of discrimination with respect to Defendant's selection of Plaintiff's position for elimination because she has not identified a similarly-situated individual who was retained as part of Defendant's reduction in force.  (Def.'s Mem. Supp. Mot. Summ. J. 11.)

In order to "satisfy the fourth element of the *prima facie* case where, as here, the basis of a plaintiff's claim is an employment termination conducted in the context of a reduction in force,

she must present evidence that similarly situated persons outside of her protected class were retained." Jackson v. Temple Univ. Hosp., Inc., 501 F. App'x 120, 122 (3d Cir. 2012) (internal citations omitted) (affirming district court's grant of summary judgment in favor of the employer). In Jackson, an employee claimed that she was discriminated against on the basis of race when her position was eliminated in response to "significant monetary losses" incurred by her employer's corporate parent and which required a reduction in force. Id. at 121. To accomplish the reduction in force, "it was determined that the positions that had the least impact on patient care and that involved duties that could be assumed by other employees would be the ones that would be eliminated." Id. The plaintiff in that case was selected for layoff because hers was one of two positions in her department that did not require state certification. Id.

Here, like in Jackson, Plaintiff's employer was tasked with reducing its number of employees in light of budget issues. As in Jackson, Plaintiff has not provided evidence that "similarly situated persons outside of her protected class were retained." Id. As Defendant points out, of eight neuroradiologists in the Radiology Department, Plaintiff was the only non-full-time neuroradiologist. Plaintiff also had an employment contract with a ninety days' notice requirement prior to termination, whereas the full-time, faculty neuroradiologists in the same department as Plaintiff had contracts with one year's notice requirements. As there were no other part-time, non-faculty neuroradiologists who were retained at the time Plaintiff was laid off[11] due to anticipated budget shortfalls, Plaintiff cannot establish the fourth element of a *prima facie* case of discrimination with respect to her termination.

---

[11] Plaintiff states that Gregory Zimmaro, the Assistant Dean of Human Resources and Administration for Temple Medical School, "claims that he 'reviewed' the decision" to eliminate Plaintiff's position to ensure nondiscrimination. (Pl.'s Mem. Opp. Summ. J. 6 (citing Zimmaro Dep., 32:9–33:23).) Zimmaro testified that he checked an employee database to determine whether any other physicians were classified as non-faculty part-time neuroradiolgists, and that if there had been, he would have investigated further to determine whether that person or those

Plaintiff asserts that "[t]here is no objective evidence that the volume of neuroradiology work was decreasing" and that "at the time the decision was made to terminate one neuroradiologist, there was an increasing trend in the volume of neuroradiologic work."[12] (Pl.'s Mem. Opp. Summ. J. 3.)  Even if accurate, Plaintiff's assertion that the volume of neuroradiologic work was increasing would not negate Defendant's explanation that it had to lay off employees because of budget issues.[13]  Plaintiff also argues that the means of measuring radiologist productivity Defendant used were not appropriate for measuring her productivity and that at least one other physician, Dr. Kochan, believed that Plaintiff was fired so that the remaining neuroradiologists in the department could increase their productivity and attain Defendant's desired benchmarks.  (Id. at 16 (citing Kochan Dep., 36:18–22).)  Apparently only one physician was able to attain the desired benchmark, which Plaintiff argues shows that Plaintiff's "termination was ineffectual."  (Id. (citing Kochan Dep., 32:15–18).)  Even if Defendant's goal of increasing productivity of the retained radiologists was not ultimately

_____

people were performing comparable work to Plaintiff to further determine the propriety of selecting Plaintiff for separation.  (Id. at 6–7 (citing Zimmaro Dep., 32:9–33:23).)  Because Plaintiff was the only non-faculty part-time neuroradiologist, Zimmaro did not investigate further.  (Id. at 7 (citing Zimmaro Dep., 32:17–33:7).)

[12] Plaintiff does not provide a citation to specific evidence for that assertion other than her own deposition testimony and that of Dr. Kochan, who believed there was sufficient work for a full-time neuroradiologist faculty member.  (Pl.'s Mem. Opp. Summ. J. 4 (citing Kochan Dep., 54:5–55:5).)  Plaintiff apparently "was overwhelmed with work to the extent that she asked Dr. Jeffrey Kochan, then the Chief of Neuroradiology, to have a neuroradiologist at Temple's main hospital read some of the Jeanes neuroradiology cases."  (Id. at 3 (citing Jones Dep. Vol. I, 99:12–24).)

[13] Plaintiff also relies on Mr. Zink's deposition testimony where he stated that he did not test additional productivity scenarios and that "other than saving the cost of her salary, there was no benefit to defendant in terms of productivity from firing [Plaintiff]" to show that Defendant's reasons for laying off Plaintiff were pretextual.  (Pl.'s Mem. Opp. Summ. J. 5 (citing Zink Dep., 30:23–31:1).)  In fact, Mr. Zink's testimony supports Dr. Jungreis's proffered explanations that in light of the budget shortfall he needed to eliminate a physician position and that Plaintiff was selected in part because of the shorter termination notice requirement in her contract and in part because she was not a full-time faculty member.

achieved, Defendant's reasons for terminating Plaintiff's employment—the ninety days' termination notice provision in her contract and her status as the only part-time employee in her department—are not rendered pretextual because the retained employees did not ultimately achieve those benchmarks.

The Court also does not find pretextual Defendant's impending implementation of a system that allows radiologists to read films remotely, which eliminated the need for a neuroradiologist on site at Jeanes Hospital, where Plaintiff worked.  Plaintiff argues that Defendant's reasons must be pretextual because Defendant did not obtain a waiver from the Jeanes Hospital CEO for the contractual requirement until after Dr. Jungreis decided to eliminate Plaintiff's position.  (Pl.'s Mem. Opp. Summ. J. 15.)  Plaintiff asserts that "the mere fact that the implementation of PACS may have lessened the need for an on-site neuroradiologist at Jeanes does not, *ipso facto*, mean that [Plaintiff] should have been terminated.  Dr. Jungreis could have selected another neuroradiologist to terminate and move [Plaintiff] to whatever location was appropriate."  (Id.)  However, Plaintiff's suggestions about what Defendant could have done differently when faced with a budget shortfall and an opportunity to have radiologists read films remotely, thereby eliminating the need for having neuroradiologists physically present in multiple locations, is not evidence that Defendant's reasons for eliminating Plaintiff's position are pretextual.  Moreover, unless there is evidence of discrimination, the court is neither permitted to assess the subjective business decisions of the employer, nor set its own employment standards for the employer.  See Ezold v. Wolf, Block, Schorr & Solis–Cohen, 983 F.2d 509, 527 (3d Cir. 1992).

Plaintiff also argues that Dr. Jungreis's testimony that other radiologists who had additional skills in mammography and musculoskeletal imaging, skills that Plaintiff did not have,

should have been let go instead of Plaintiff since they could all do body imaging work.  (Pl.'s Mem. Opp. Summ. J. 18.).  Specifically, Plaintiff argues that "[b]ecause [Plaintiff] was competent to perform body imaging work, Dr. Jungreis' refusal to consider terminating any of the physicians discussed above instead of [Plaintiff] is evidence that her alleged lack of ability to perform such work was a pretext he relied on in terminating her."  (Id.)  This unsupported argument is not a sufficient basis on which a reasonable factfinder could rule in her favor.  Finally, Plaintiff lists numerous other physicians who could have been fired instead of her for various reasons,[14] but ultimately does not provide evidence to show that Defendant's stated reasons for laying off Plaintiff rather than the retained, full-time physicians are pretextual.

Having found that Plaintiff did not show that Defendant's proffered legitimate, non-discriminatory reasons for selecting Dr. Caputo as Chief of Radiology were pretextual, and having found that Plaintiff did not establish a *prima facie* case of discrimination with respect to her layoff and termination of employment with Defendant, Defendant's Motion for Summary Judgment with respect to the entirety of Count One of Plaintiff's Complaint is granted.

## 2.  Gender Discrimination

Count Two alleges that Plaintiff was disciplined and ultimately terminated because of her sex, and that male employees similarly situated to Plaintiff were not similarly hired under less

---

[14] Plaintiff also argues that Defendant's reasons are pretextual because instead of eliminating her position, a doctor with another subspecialty could have been let go rather than someone from the neuroradiology group; because other physicians who had not been there as long as she had were not let go; and because Dr. Shah was advised to increase his productivity but she was not.  (Pl.'s Mem. Opp. Summ. J. 17–18.)  The fact that Plaintiff was not advised to increase her productivity, even if Dr. Shah was so advised, is not evidence that Defendant's reasons for terminating Plaintiff were pretextual.  Indeed, it is the long-standing law of the Third Circuit that in cases of employment discrimination brought under 42 U.S.C. § 1981, "managers are not compelled to convey their dissatisfaction to employees" and failure to do so does not show pretext.  Healy v. N .Y. Life Ins. Co., 860 F.2d 1209, 1216 (3d Cir. 1988).  Thus, for purposes of Plaintiff's § 1981 claim, addressed below, Plaintiff's argument regarding the warning given to Dr. Shah is not persuasive.

desirable circumstances, disciplined, transferred, or not promoted, and did not ultimately lose their employment, in violation of 42 U.S.C. § 2000e et seq.[15]  Plaintiff argues that she has established a *prima facie* case of sex discrimination based on Defendant's failure to select her for the position of Chief of Radiology at Jeanes Hospital, because she is a "Black female" and "was qualified to serve as Chief of Radiology," and because "a White male" was ultimately selected as the Chief of Radiology.  (Pl.'s Mem. Opp. Summ. J. 12.)   Defendant argues that Plaintiff has not proved a *prima facie* case of discrimination nor has she rebutted Defendant's legitimate, non-discriminatory reason for selecting Dr. Caputo for the chairperson position.

As stated above, Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin."  42 U.S .C. § 2000e-2(a)(1).  Since Plaintiff in this case seeks to establish employment discrimination based on her sex through indirect evidence, the Court follows the evidentiary framework first set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and subsequently refined in Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981).  As stated previously, under this framework Plaintiff must show, by a preponderance of the evidence, a *prima facie* case of discrimination, after which Defendant must articulate some legitimate, nondiscriminatory reason for the adverse employment actions.  McDonnell Douglas, 411 U.S. at 802.  If Defendant can meet this burden, Plaintiff must show that the reasons articulated by Defendant were actually pretext for discriminatory practices.  Id. at 804.  As stated above,

---

[15] Plaintiff "concedes that the evidence does not support a claim of sex discrimination with respect to her termination," but argues that the Court should deny Defendant's Motion for Summary Judgment with respect to Plaintiff's sex discrimination claims related to Defendant's failure to select her for the position of Chief of Radiology at Jeanes.  (Pl.'s Mem. Opp. Summ. J. 13, 13 n.14.)  The Court also finds that the evidence does not support a claim of sex discrimination with respect to any alleged disciplinary actions or transfers.

summary judgment is appropriate on behalf of Defendant if Plaintiff fails to meet her burden at either the *prima facie* or pretext stage of the framework.

As discussed above, in the Third Circuit, in order to establish a *prima facie* case for failure to hire, a plaintiff must show that he or she applied for the position in question. See Fowle v. C&C Cola, 868 F.2d 59, 61 (3d Cir. 1989) (internal citations omitted). The requirement that a plaintiff apply for a position is satisfied if the employer had some reason or duty to consider the plaintiff for the position. Id. at 68 (citing Carmichael v. Birmingham Saw Works, 738 F.2d 1126, 1133 (11th Cir. 1984)). Where an employer had not given formal notice of a position's availability, it has an obligation to consider those employees "who might reasonably be interested" in the position. Fowle, 868 F.2d at 68.

Defendant argues that Dr. Jungreis would not have thought Plaintiff would be interested in the chairperson position because it was full-time and became available at a time when Plaintiff had expressed a strong preference for a part-time position at Jeanes. Plaintiff responds that Defendant's contention "makes no sense" and should be rejected by the Court, in light of Dr. Caputo's deposition testimony that Dr. Jungreis told him there was a vacancy and that he was specifically being recruited for the chairperson position. (Pl.'s Mem. Opp. Summ. J. 12 (citing Caputo Dep., 10:1–11:17).)

Even assuming, *arguendo,* that Defendant should have known that Plaintiff would reasonably have been interested in the chairperson position at Jeanes, and that Plaintiff could demonstrate a *prima facie* case of gender discrimination, Defendant articulated legitimate, nondiscriminatory reasons for selecting Dr. Caputo as Chief of Radiology rather than Plaintiff. Defendant asserts that Dr. Caputo was selected because he was well-qualified and had radiology experience as well as administrative experience, and in fact had ten years more administrative

experience than Plaintiff, and because current faculty members at Temple who had worked with Dr. Caputo in the past recommended him for the chairperson position.

As discussed above, a plaintiff alleging employment discrimination on the basis of race or gender can show pretext in one of two ways: "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764. Under the law of this Circuit, notably Fuentes v. Perskie, 32 F.3d 759 (3d Cir. 1994), it is incumbent upon Plaintiff to point to evidence which demonstrates "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Defendant's reasons that one could reasonably conclude that the reasons are untrue.

Plaintiff argues that Defendant's explanations are pretextual because (1) Defendant has a "poor track record of hiring Black physicians;" (2) "Dr. Jungreis' fail[ed] to post the position, in violation of defendant's policy that required that the position be posted;" (3) Dr. Jungreis aggressively pursued Dr. Caputo to the exclusion of any other qualified candidate, such as Plaintiff; and (4) Dr. Jungreis also contended that the Chief of Radiology position was not a separate position and therefore did not have to be posted, which "merely underscores Dr. Jungreis' desire to select Dr. Caputo for the position, regardless of the qualifications of other potential candidates, such as [Plaintiff]." (Pl.'s Mem. Opp. Summ. J. 13.)

Aside from contesting Dr. Jungreis's understanding of when a physician job opening, rather than an internal departmental leadership position, should be posted, Plaintiff offers no evidence to substantiate her accusations of gender discrimination, nor anything from which a reasonable factfinder could find Defendant's reason for selecting Dr. Caputo as Chief of

Radiology "unworthy of credence." Fuentes, 32 F.3d at 764.  In light of the fact that Defendant selected Dr. Caputo for a full-time position for which he was qualified, instead of Plaintiff who had recently expressed a desire for a part time schedule and who was not as experienced as Dr. Caputo, no reasonable jury could find that Plaintiff's gender played a role in Defendant choosing not to select Plaintiff as the chairperson of radiology at Jeanes and instead choosing to select Dr. Caputo.  Accordingly, the Court will grant Defendant's Motion for Summary Judgment with respect to the entirety of Count Two of Plaintiff's Complaint.

### 3.  **Retaliation**

Count Three of Plaintiff's Complaint alleges that Plaintiff reported claims of discrimination to her employer, and asserts that Defendant retaliated against her by taking actions which have limited her ability to obtain subsequent employment because she asserted claims of discrimination against Defendant, in violation of 42 U.S.C. § 2000e et seq.  As Plaintiff "concedes that defendant is entitled to summary judgment on [the retaliation] claim only," (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. 1 n.1.), the Court will grant Defendant's Motion for Summary Judgment with respect to Count III.

### B.  **42 U.S.C. § 1981**

Count Four of Plaintiff's Complaint alleges that Defendant intentionally discriminated against Plaintiff because of her race and sex in violation of 42 U.S.C. § 2000e et seq., thereby violating 42 U.S.C. § 1981.  Plaintiff claims that she was intentionally disciplined and ultimately terminated under circumstances constituting discrimination.  Plaintiff further alleges that non-female and/or non-African American employees similarly situated to Plaintiff were not similarly hired, disciplined, transferred, not promoted, or terminated.

"To succeed on a Title VII or Section 1981 claim of race discrimination, a claimant must establish that he was the subject of purposeful discrimination." Robinson v. Home Depot, Inc., No. Civ.A.06–935, 2009 WL 2960990, at *1, *15 (D.N.J. Sept. 11, 2009) (citing Weldon v. Kraft, 896 F.2d 793, 796 (3d Cir. 1990)).  "Ordinarily, to establish a basis for relief under section 1981 a plaintiff must show (1) that he belongs to a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in § 1981." Blakney v. City of Phila., No. Civ.A.12-6300, 2013 WL 2411409, *7 (E.D. Pa. June 4, 2013) aff'd, No. Civ.A.13-3062, 2014 WL 1045300 (3d Cir. Mar. 19, 2014) (citing Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 569 (3d Cir. 2002); Estate of Oliva ex rel. McHugh v. N.J., 604 F.3d 788, 797–98 (3d Cir. 2010)).  Where, as here, the plaintiff does not present direct evidence of discrimination, courts apply the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green discussed above.  See Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999) (citing McDonnell Douglas, 411 U.S. at 802); see also Jackson, 501 F. App'x at 123 n.2 (citing Jones, 198 F.3d at 410) ("[Plaintiff's] claims under 42 U.S.C. § 1981 are governed by standards identical to those applicable to her Title VII claims").

Having found that Defendant is entitled to summary judgment on Plaintiff's Title VII claims, "based on [the Court's] preceding analysis, [Defendant] is also entitled to summary judgment on [Plaintiff's] § 1981 claims." Jackson, 501 F. App'x at 123 n.2.  Accordingly, Defendant's Motion for Summary Judgment with respect to Count Four of Plaintiff's Complaint is granted.

C.       **42 U.S.C. § 1983 Claim**

Count Eight of Plaintiff's Complaint alleges that Defendant is a state entity which acts under color of state law and which violated the Fourteenth Amendment to the United States Constitution by hiring Plaintiff under less than desirable circumstances, disciplining, transferring, failing to promote, and ultimately terminating Plaintiff because of her race and/or sex.  Plaintiff alleges these actions were unlawful and entitle her to damages under 42 U.S.C. § 1983.  In the Complaint, Plaintiff asserted that "the acts of racial discrimination against her violate her rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution."  (Compl. ¶ 7(E).)[16]

42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . ."  To recover under § 1983, Plaintiff must show first that Defendant "subjected her to the deprivation of a right 'secured by the constitution and laws;' and second, that while doing so, Defendant[] acted under color of Pennsylvania law."  Joyner v. Sch. Dist. of Phila., 313 F. Supp. 2d 495, 500 (E.D. Pa. 2004) (internal citation omitted).  Under the Equal Protection Clause, all persons are not entitled to be treated identically; rather the concept of equal protection stands for the principle that "all persons similarly situated should be treated alike."  Artway v. Att'y Gen. of N.J., 81 F.3d 1235, 1267 (3d Cir. 1996) (quoting City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)).  "'To state a claim under the Equal

---

[16] Because Plaintiff alleged violations of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, her § 1983 claim is not subsumed by her Title VII claims.  See, e.g., Joyner v. Sch. Dist. Of Phila., 313 F. Supp. 2d 495, 501 (E.D. Pa. 2004) (citing Middlesex County Sewerage Auth. V. Nat'l Sea Clammers Ass'n, 453 U.S. 1, 20 (1981).

Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class.'" Shoemaker v. City of Lock Haven, 906 F. Supp. 230, 238 (M.D. Pa. 1995) (quoting Henry v. Metro. Sewer Dist., 922 F.2d 332, 341 (6th Cir. 1990)) (further quotations omitted).

In addition to her non-selection and termination claims discussed previously,[17] Plaintiff alleged in the Complaint that when she worked as a neuroradiologist at Temple Main she was the only physician under a particular supervisor who was hired without benefits, did not receive an academic appointment, did not have an office or secretarial support, and was not invited to give resident conferences.  (Compl. ¶ 17.)  Plaintiff also alleged that she was moved from MRI duty to CAT scan duty "to give the more desired rotation to other non[-]African American neuroradiologists."  (Compl. ¶ 19(B).)

Plaintiff's allegations that she was treated differently because of her race are not supported by the evidence set forth for the Court's consideration.  Plaintiff was hired as a part-time employee because she applied for and expressed a preference for a part-time position, and did not initially receive benefits because she was a part-time employee.  Plaintiff did not receive an academic appointment because the position for which she applied and was hired was a non-faculty position, and she was not invited to speak at resident conferences because she was not a member of the faculty whose position required that she do so.  Plaintiff did not have a private office or her own secretary, but neither did her colleagues.  For example, Dr. Shah's work conditions include sharing office space and a secretary with other faculty members.  (Def.'s Mem. Supp. Mot. Summ. J. 6; Shah Dep., 24:2–6; 29:16–21.)  Plaintiff does not point to any

---

[17] As the Court found that summary judgment for Defendant is appropriate for Plaintiff's non-selection and termination claims under Title VII, § 1981, and Plaintiff's Pennsylvania state law claims, the Court finds that summary judgment is also appropriate for the Defendant with respect to Plaintiff's non-selection and termination claims under § 1983.

evidence in the record to support her claim that she was given a less desired rotation on CAT scan duty, rather than MRI duty.  In light of these facts, Defendant's Motion for Summary Judgment with respect to Plaintiff's § 1983 claim is granted.

**IV.     CONCLUSION**

Having reviewed the briefs and pleadings and their exhibits, and having reviewed the arguments of counsel, the Court finds that Plaintiff has not set forth evidence that would enable a jury to reasonably find in her favor.  Accordingly, the Court shall grant Defendant's Motion for Summary Judgment in its entirety.

An appropriate Order follows.